1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

9
10
11
12
13

THE PROTECT OUR
COMMUNITIES FOUNDATION,
BACKCOUNTRY AGAINST
DUMPS, and DONNA TISDALE,

                       Plaintiffs,

   vs.

CASE NO. 12cv2212-GPC(PCL)

**ORDER DENYING PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT AND GRANTING
FEDERAL DEFENDANTS AND
OCOTILLO'S MOTIONS FOR
SUMMARY JUDGMENT**

14
15
16
17
18
19
20
21
22
23
24

DANIEL M. ASHE, Director of U.S.
Fish and Wildlife Service; REN
LOHOEFENER, Regional Director,
Pacific Southwest Region, for U.S.
Fish and Wildlife Service; JIM A.
BARTEL, Field Supervisor, Carlsbad
Fish and Wildlife Office, U.S. Fish
and Wildlife Service; U.S. FISH AND
WILDLIFE SERVICE, a federal
agency; and UNITED STATES
DEPARTMENT OF THE INTERIOR,
a federal agency,

     Defendants

OCOTILLO EXPRESS LLC,

Defendant-Intervenor,

                  Defendant.

[Dkt. Nos. 21, 24, 27.]

25
26
27
28

    Plaintiffs The Protect Our Communities Foundation; Backcountry Against
Dumps; and Donna Tisdale ("Plaintiffs") filed a complaint challenging the United
States Department of the Interior and U.S. Fish and Wildlife Service's issuance of a

Biological Opinion ("BiOp") for the Ocotillo Wind Energy Facility Project ("OWEF" or "Project"), a utility-scale wind power project in the Sonoran Desert in Imperial County, California. The complaint alleges Defendants violated the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* and seeks relief under the Administrative Procedures Act ("APA"). Specifically, they challenge that the Biological Opinion's conclusion that the Project is not likely to jeopardize the continued existence of Peninsular Bighorn Sheep ("PBS") is inadequate and violates the ESA.

### Procedural Background

On September 11, 2012, Plaintiffs filed a complaint for declaratory and injunctive relief against Defendants Daniel M. Ashe, Director of U.S. Fish and Wildlife Service; Ren Lohoefener, Regional Director, Pacific Southwest Region for U.S. Fish and Wildlife Service; Jim A. Bartel, Field Supervisor, Carlsbad Fish and Wildlife Office, U.S. Fish and Wildlife Service; U.S. Fish and Wildlife Service, a federal agency; and United States Department of the Interior, a federal agency (collectively referred to as "Federal Defendants"). (Dkt. No. 1.) On October 4, 2012, the case was transferred to the undersigned judge. (Dkt. No. 5.) On October 22, 2012, the Court granted the joint motion for permissive intervention of Defendant-Intervenor Ocotillo Express, LLC ("Ocotillo"), the Project proponent. (Dkt. No. 10.)

On March 29, 2013 and June 21, 2013, the administrative record was lodged with the Court. (Dkt. Nos. 17, 20.) On July 17, 2013, Plaintiffs filed a motion for summary judgment. (Dkt. No. 21.) On August 16, 2013, Federal Defendants and Ocotillo filed their cross motions for summary judgment and oppositions to Plaintiffs' motion for summary judgment. (Dkt. Nos. 24, 27.) On September 6, 2013, Plaintiffs filed their oppositions and their replies to their motion for summary judgment. (Dkt. Nos. 29, 30.) Federal Defendants and Ocotillo filed their replies on September 27, 2013. (Dkt. Nos. 31, 32.)

### Factual Background

On December 19, 1980, the Department of the Interior approved a Record of

Decision ("ROD") for the California Desert Conservation Area ("CDCA") which established a "long-range, comprehensive plan for the management, use, development, and protection of over 12 million acres of public land . . . ." On October 9, 2009, Ocotillo applied to the Bureau of Land Management ("BLM") and to the County of Imperial to construct and operate a wind energy facility on public land within the CDCA. (SAR 8036-37.) The original number of wind turbines proposed of 193 was reduced to 155 in order to minimize environmental impacts. (SAR 8037.) In February 2012, Interior created a Proposed Plan Amendment & Final Environmental Impact Statement/Final Environmental Impact Report ("Final EIS" or "FEIS/FEIR") for the Ocotillo Wind Energy Facility analyzing the impact of a 12,484 acre right-of-way ("ROW") over public land in favor of Ocotillo to build 155 wind turbine generators. (SAR 7994.) After extensive environmental analysis, the Project was further reduced to 112 wind turbines on 10,151 acres of public lands. (Dkt. No. 21-3, Volcker Decl., Ex. 1, Record of Decision.) On May 11, 2012, the Department of the Interior approved a Record of Decision ("ROD") for the Ocotillo Wind Energy Facility and Amendment to the California Desert Conservation Area Plan which approves a 10,151 acre right-of-way over public land in favor of Ocotillo to build 112 wind turbine generators. (Id.)

The PBS, at issue, are a distinct population segment of the desert bighorn sheep (*Ovis canadensis nelsoni*) that live in the Peninsular ranges of southern California and Baja California, Mexico. (AR 1688.) The sheep numbered approximately 971 individuals in 1972 and 1,171 individuals in 1974. (AR 5781.) By 1996, the Service estimated sheep populations at approximately 276 individuals. (AR 1689.) The reasons for the decline in population numbers were due to a combination of threats of the effects of disease and parasitism; low lamb recruitment and habitat loss, degradation, and fragmentation; and predation. (SAR 4324.) The PBS was federally listed as an endangered species on March 18, 1998. (AR 1688; 63 Fed. Reg. 13134.) On October 25, 2000, in order to address these threats, and pursuant to its authority

under the ESA, the Fish and Wildlife Service ("FWS") approved a recovery plan for the sheep. (AR 5733.) The recovery strategy included three delisting criteria: 1) at least 25 ewes must be present in each of the nine regions . . . during each of 12 consecutive years; 2) the rangewide population must average 750 individuals (adults and yearlings) with a stable or increasing population trend over 12 consecutive years; and 3) regulatory mechanisms and land management commitment must be established to provide long-term protection and connectivity among all portions of habitat must be established so that PBS are able to move freely throughout the Peninsular Ranges. (AR 1711.)

In 2010, the PBS range-wide population increased to an estimated 955 sheep. (AR 1689.) In the BiOp, the FWS noted that the sheep population in Recovery Region 9 (Carrizo Canyon/Tierra Blanca/Coyote Mountain) numbered about 232 individuals, including "presumably far more than 25 ewes if one assumes a relatively balanced sex ratio" and is the largest of the nine populations identified in the recovery plan. (AR 1711.) As of April 2011, eight of the nine recovery regions supported at least 25 ewes as required by Recovery Criterion 1. (AR 6473-75.)

In order to minimize adverse effects to the PBS, BLM and Ocotillo redesigned the Project to avoid placing any facilities within and directly adjacent to steep, escape-route habitat" (AR 266.) Moreover, mandatory conservation measures were created to protect and conserve the sheep. (AR 267 (15 miles per hour speed limit)); (AR 268 (weed management plan to control nonnative weeds, night lighting minimization; education program; a Designated Biologist to ensure compliance; biological monitors during construction and operation activities)); (AR 269 (no construction during lambing season, from Jan. 1 through June 30,within .75 miles of identified lambing sites; development of sheep monitoring/reporting plan)); (AR 1684 ($200,000.00 contribution towards a sheep study/research program)); (AR 1709-10 (restoration of Carrizo Marsh to restore important water source that is currently not suitable for sheep use)).00

**A.    Standard of Review**

The Administrative Procedures Act ("APA") governs judicial review of agency actions under the Endangered Species Act. See 5 U.S.C. § 706; see also Bennett v. Spear, 520 U.S. 154 (1997).  An agency's decision must be upheld under judicial review unless the court finds that the decision or action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Actions that are approved "without observance of procedure required by law" are also subject to be set aside upon judicial review.  5 U.S.C. § 706(2)(D).

"An agency decision is arbitrary and capricious if, among other things, it 'offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1053 (9th Cir. 2012) (citation omitted).  The standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).  Agency action is valid if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." Arrington v. Daniels, 516 F.3d 1106, 1112 (9th Cir. 2008) (citations omitted); see also Nat'l Wildlife Fed v. U.S. Army, 384 F.3d 1163, 1170 (9th Cir. 2004) (an agency must present a "rational connection between the facts found and the conclusions made.").  The burden is on Plaintiff to show any decision or action was arbitrary and capricious.  See Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976).

A court will not vacate an agency's decision unless it

has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Nat'l Ass. of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007)

(citation omitted).  "We will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Id. (quoting Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

**B.    Endangered Species Act ("ESA")**

Plaintiffs present four arguments in support of their motion for summary judgment.  First, the Biological Opinion ("BiOp") is arbitrary and capricious because it improperly downplays the significance of lower elevation, valley-floor habitat for PBS.  Second, the BiOP is arbitrary and capricious because it ignores evidence that bighorn sheep are poor dispersers.  Third, the BiOP is arbitrary and capricious because it improperly downplays the potential for the project to cause stress and associated adverse effects.  Lastly, the BiOP fails to use the best available scientific evidence.

The ESA was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation" of such species.  16 U.S.C. § 1531(b).  Section 7 of the ESA "prescribes steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora." Nat'l Ass'n of Home Builders, 551 U.S. at 652; see also 16 U.S.C. § 1536(a)(2).

Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habit of such species."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(h)(3).  The consulting agency must "review all relevant information", "evaluate the current status of the listed species or critical habitat", "evaluate the effects of the action and cumulative effects on the listed species or critical habitat", and issue a Biological Opinion assessing whether the proposed action is "likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(1)-(4); (h)(3).  The BiOp must include "a summary of the information on which the opinion is based" and

"a detailed discussion of the effects of the action on listed species or critical habitat." Id. § 402.14(h)(1), (2). Both the action agency and the consulting agency must use the "best scientific and commercial data available" during the consultation process and in drafting the BiOp. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8).

After an agency has issued a no jeopardy biological opinion, the FWS must prepare an incidental take statement ("ITS") if the action will incidentally take members of a listed species which will not violate the ESA. 16 U.S.C. § 1536(b)(4); 50 C.F.R. 402.14(g)(7). "[A]n ITS is not part of the jeopardy analysis, but instead provides an exemption from [take] liability under Section 9 of the ESA." Center for Biological Diversity v. U.S. Bureau of Land Management, 746 F. Supp. 2d 1055, 1120 (N.D. Cal. 2009), vacated in part on other grounds, 2011 WL 337364 (N.D. Cal. Jan. 29, 2011).

On May 20, 2011, the BLM initiated consultation under Section 7 and submitted a biological assessment to the FWS outlining the potential effects of its proposed right-of-way grant authorizing the construction and operation of the Project, on the PBS and its critical habitat. (AR 156; 249 (revised on August 1, 2011).)

On April 26, 2012, the FWS issued its biological opinion ("BiOp")[1] on the federally endangered Peninsular bighorn sheep[2] in accordance with section 7 of the Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq. (AR 1673-1737.) It concluded that "the proposed action is not likely to jeopardize the continued existence of either species".[3] (AR 1718.) While the BiOp found that some of the effects of the

---

[1]The BiOp dated April 26, 2012 predates the BLM's May 11, 2012 ROW grant. Therefore, the BiOp analyzed the effects of 155 turbines situated on 12,435 acres. (AR 1674-75.)

[2]The BiOp also included a biological opinion on the least Bell's vireo which is not subject to the litigation in this case.

[3] The FWS's no jeopardy conclusion was based on the following reasons:

1.   While the proposed project is adjacent to habitat with high value resources and heavy sheep use on three sides, sheep sign and sightings indicate that sheep use the project site irregularly.

2.   Sheep continue to use habitat on and around the action area despite

[12cv2212-GPC(PCL)]

proposed Project may adversely affect the sheep, (AR 1697-1709), the FWS also found the Project's expected impact, assuming the worst case scenario of permanently losing 5,156 acres of suitable habitat in and around the Project site, was not likely to negatively affect the PBS's continued recovery. (AR 1710-12.) The FWS issued an Incidental Take Statement and concluded that up to five adult ewes and their lambs could be incidentally taken as a result of the Project. (AR 1719, 1720-21.) The loss of "up to five ewes are not expected to lead to a substantial decline in population numbers or alter the continued southward range expansion." (AR 1711.)

## C.   Significance of Lower Elevation, Valley-Floor Habitat and its Importance for Foraging

Plaintiffs argue that the Project site's lower elevation, valley-floor areas, including hundreds of washes and alluvial fans, provide habitat uniquely valuable for

---

relatively high levels of human and vehicular use of the area (e.g., Border Patrol, OHVs, and I-8). Because this population of bighorn sheep likely has become accustomed to some degree to human presence and noise in their environment, we expect that neither human use nor the prevalence of noise is expected to increase substantially during O&M over baseline levels.

3. The effects of construction, O&M, and decommissioning would be minimized by implementation of conservation measures described above in the Description of the Proposed Action section.

4. The relatively pristine rugged mountain habitat on three sides of the project, which includes critical habitat, will continue to provide necessary resources for sheep.

5. The range expansion of Peninsular bighorn sheep into an area that reportedly was no longer occupied by 1996 demonstrates the ability of this population to regain former movement patterns and recolonize their historic range.

6. The potential functional loss of up to 5,156 ac of habitat, if avoided by sheep, represents a small fraction of comparable habitat otherwise available to the population and this potential loss would not disrupt population connectivity or cause other significant impacts.

7. The potential for reproductive loss due to avoidance of lambing grounds in the action area would not be significantly impact the survival or recovery of the DPS as a whole.

8. The proposed project is not likely to impede connectivity between the I-8 Island and suitable habitat to the south, as primary movement corridors are outside the action area.

9. The proposed removal of tamarisk from Carrizo Marsh would represent a significant contribution in support of the range-wide recovery of the species.

(AR 1718.)

[12cv2212-GPC(PCL)]

Bighorn sheep and the BiOp ignored the importance of this habitat and its importance for foraging. Plaintiffs assert that the FWS failed to reasonably explain its conclusion that the potential loss of 3,692 acres of suitable forage habitat would not be significant to the sheep. Federal Defendants and Ocotillo disagree because Plaintiffs' argument is based on the assumption that all low-elevation, valley-floor habitat is *per se* suitable for sheep habitat.

A "suitable habitat"[4] consists only of those "areas within 800 m (one-half mile) of slopes equal to or greater than 20 percent." (AR 288.) This was determined on a number of studies that showed that most sheep sightings were associated with slopes 20% or greater, and the sheep were observed within 800 meters of mountainous habitat feeding in or moving across moist, low-elevation washes and alluvial fans, and that sheep do not venture far from water sources. (AR 5906-09.) These areas contain the preferred habitat features of escape terrain, water, and low-elevation/alluvial-fan habitat. (AR 5906-09; SAR 4717-18.) Based on this standard, the FWS mapped all suitable habitat throughout the sheep's range which totaled 844,897 acres of habitat. (SAR 4717-18; see AR 5762 (map), 5814 (map), 5822 (map).) In April 2009, the FWS analyzed the 844,897 acres of suitable habitat and designated a portion, 376,938 acres, as "critical habitat."[5] (SAR 7734.)

The FWS concluded that 30% of the Project site's valley floor habitat or 3,692 acres within the proposed 12,458[6] acre right of way grant, is suitable sheep habitat. (AR 1674; 1699.) The 3,692 acres of suitable habitat are not located within critical habitat and are .004% of the 844,897 acres of mapped suitable habitat across the

---

[4]"Essential Habitat" as defined by the FWS within the Project Area is equated to "Suitable Habitat" for PBS. (AR 288.)

[5]On February 1, 2001, the FWS designated critical habitat. (SAR 4712.) However, on April 14, 2009, the FWS revised the critical habitat designation. (SAR 7696.) In that designation, the FWS identified 376,938 acres of critical habitat.

[6]While the BiOp states that the proposed ROW grant was 12,458 acres, the BLM conducted a Final EIS based on the proposed ROW of 12,484 acres. (Compare AR 1674 with SAR 7994.)

[12cv2212-GPC(PCL)]

sheep's range.

Defendants do not dispute that lower elevation and valley floor habitat is important for the PBS and that habitat loss can impact a sheep's ability to forage, reproduce, find water, avoid predators and move among important resource areas. (SAR 6040.)  Plaintiffs also do not dispute how the FWS defined "suitable habitat" to consist only of those "areas within 800 m (one-half mile) of slopes equal to or greater than 20 percent."  (AR 288.)

Under the ESA, the FWS is not to prevent the "take" of all PBS but to assess whether the Project is likely to jeopardize the continued existence of the PBS. See 16 U.S.C. § 1536(a)(2).  According to the administrative record, 30% of the Project site's valley floor habit is suitable sheep habitat.  None of this area is located in designated critical habitat and the suitable habitat in and around the Project site "represents a small fraction of comparable habitat otherwise available to the population."  (AR 1701.) Moreover, the survey data revealed little sheep occurrence and use within the action area. (AR 1701).  Therefore, the FWS concluded that the potential loss of  30% of suitable habitat would be minimal especially because the suitable habitat, not critical habitat, around the Project area is only .004% of the 844,897 acres of mapped suitable habitat across the sheep's range.  While the loss of 3,692 acres, facially appears great, in looking at all the factors, this loss of habitat would not be a significant loss to the species as a whole.  (AR 1701, 1718.)  Therefore, the FWS's conclusion that the potential loss of 3,692 acres of suitable habitat is not likely to jeopardize the continued existence of the PBS is rationally based on the facts and data from the administrative record.

**D.      Importance of Valley Floor Habitat for PBS Connectivity**

Plaintiffs argue that the BiOp, in concluding that the Project "would not disrupt population connectivity," downplays the significance of lower elevation, valley floor habitat within the Project site for inter-population movement of PBS.  (AR 1701;

1718.)  Federal Defendants and Ocotillo do not dispute that population connectivity[7] is important to PBS but argue that the FWS thoroughly analyzed the connectivity value of the habitat.

First, Plaintiffs argue that while the BiOp addresses sheep movement from south of the Project to areas further south of the Project, it does not examine the permanent impediment created by the Project between the populations south of the Project and those north of the Project.  As a result, they contend that the historic link between the PBS populations in the U.S. and those in Mexico in Baja California are at risk.  Federal Defendants and Ocotillo argue that the BiOp noted that connectivity corridors from suitable habitat in the west to suitable habitat in the north would be unaffected by the Project because the main PBS route through Sweeney Pass is 6 miles northwest of the project and outside the line of site of the Project.  (AR 1708.)  Further, they argue that the connectivity corridors between north and south are already restricted by the I-8, the town of Ocotillo, and off-highway vehicle use.  (AR1708.)  Therefore, because of these impediments, the north-south connectivity corridors in the vicinity of the Project are likely limited to the areas southwest of the Project site given the presence of suitable habitat and lack of connectivity barriers.   (AR 1708.)  The FWS explained that the Project would not affect the north-south connectivity corridors located within critical habitat and that the Project would not further restrict, besides the already existing barriers, connectivity in the area.  (AR 1708.)  The FWS determined that while the Project may adversely affect sheep dispersal within the action area, it would not impede population connectivity for the sheep as a whole at both the regional and range-wide levels.  (AR 1709.)

Moreover, even if the Project constrained connectivity within the action area, the FWS analyzed the worst case scenario.  The FWS noted that numerous connectivity corridors exist outside the action area in both suitable and critical habitat.  It explained

---

[7]When the habitat is fragmented, it can lead to isolation of sub-populations and population declines.  (AR 6433; 5816.)

[12cv2212-GPC(PCL)]

that due to connectivity constraints already in the area, the primary north-south connectivity corridors for the sheep population as a whole were mostly likely those located within the suitable and critical habitat outside the action area; and the Project would not affect these corridors. (AR 1696, 1708.)  The FWS considered the worst case scenario on PBS movement in the low-elevation migration corridors and habitat and examined the impediment created by the Project between the populations south of the Project and those north of the Project.

Second, Plaintiffs argue that the BiOp contradicts its conclusion that the Project "would not disrupt population connectivity" by admitting that the "relative value of the project site as a travel corridor is uncertain. . . ."[8] (AR 1701, 1708.)  Specifically, they allege that the Jacumba mountains represent the only area of habitat connecting the distinct population segment listed in the U.S. with other bighorn sheep populations and the Project will completely cut off any connectivity between the population segments if the sheep abandon the area completely.  Ocotillo disagrees with Plaintiffs' assumption that the PBS will entirely abandon the Jacumba Mountains.  Moreover, the BiOp recognizes that the I-8 already forms a barrier between the Carrizo Canyon subpopulation and the mountains of Mexico with the most dispersal through the I-8 island and even that pathway is impaired by the lack of undercrossing points for the eastbound lands that run south of the Island. (AR 1708.)  Therefore, the Project would not impede PBS movement to the south.  (AR 282 (map).)

Third, Plaintiffs contend that the BiOp supports its claim that the PBS did not use the Project site for inter-population movement based on lack of sign of sheep tracks.  However, lack of sign does not indicate that the area is not used as an important travel corridor. (AR 421 (FWS response to comments, "The Department disagrees with the statement that the site is unoccupied. Based on the applicant's surveys PBS have not been documented within the project site footprint.  However, absence of sheep sign

---

[8]This statement concerning the uncertainty of the Project was due to the OHV routes in the area, the I-8 barriers and the town of Ocotillo, and lack of telemetry data or sign demonstrating inter-mountain movement.  (AR 1708.)

[12cv2212-GPC(PCL)]

1    does not equate to the site being unoccupied).  The fact that the BiOp heavily relied on

2    lack of sign to assess PBS presence failed to give weight to the data confirming the

3    PBS's use of low elevation area for a variety of purpose, including movement. In

4    addition, the FWS also ignored its previous conclusion that suitable but unoccupied

5    habitats are necessary for maintaining population and genetic connectivity. (AR 423-

6    24.)

7         Federal Defendants and Ocotillo dispute the significance of the FWS's

8    comments to the BLM in the draft EIS.  They contend that the absence of sheep sign

9    comment was not related to the unreliability of sheep sign but that the Project should

10   not be considered unoccupied because sheep sign was documented throughout the

11   proposed project site. (AR 424.) As more fully discussed later, lack of sheep sign was

12   not the only basis for the FWS to conclude that the presence of PBS in the Project area

13   was limited.   There were numerous other studies, reports, data, maps, and other

14   evidence the FWS considered when it made its determination.

15        The FWS addressed the worst case scenario and concluded that the Project and

16   the potential functional loss of up to 5,156 acres of habitat  "would not disrupt

17   population connectivity." (AR 1701, 1718.)  In addition, the proposed Project is not

18   likely to impede connectivity between the I-8 Island and suitable habitat to the south,

19   as primary movement corridors are outside the action area. (AR 1718.)  The BiOp

20   evaluated the available information regarding the path that the PBS subpopulation

21   follows in their movement from their base in the Carrizo Canyon area into the Coyote

22   Mountains to the northeast and into the I-8 island to the southeast. (AR  1693-96.)

23   The BiOp presents a rational connection between the facts found and the conclusion

24   that the Project would not affect connectivity among Bighorn sheep habitats.

25   **E.    PBS as Poor Dispersers**

26        Plaintiffs argue that the BiOp is arbitrary and capricious because it ignores

27   evidence that PBS are poor dispersers and would likely remain near the Project site and

28   not move in response to habitat loss or modification.  They also assert that the FWS's

conclusion that "comparable habitat is otherwise available" to justify its jeopardy conclusion is arbitrary and capricious because comparable habitat would not assist the PBS as they are poor dispersers and unlikely to leave their home range.

Federal Defendants argue that sheep tend to be poor dispersers but only outside of their home ranges. Within their home range, the PBS are more likely to avoid the Project and move to another part of their home range. In addition, the FWS analyzed the worst case scenario of suitable habitat loss in and around the Project. (AR 1700-01.) It considered the loss of about 5,156 acres of habitat and determined that this loss of habitat would not threaten its recovery. (AR 1701.) FWS analyzed the potential for individual sheep mortality against the population as a whole and concluded that due to robust population numbers coupled with the availability of comparable suitable habitat at both the regional and range-wide levels, the Project was not likely to jeopardize the continued existence of the sheep as a whole. (AR 1718.) Ocotillo argues that the record refutes Plaintiffs' argument regarding movement within adjacent mountain ranges.

A typical home range[9] size for an ewe is 7.8 square miles and for a ram is 9.8 square miles. (AR 5764.) Sheep move across a wide area within their home ranges to access different resources. (AR 1693.) The Project area does not encompass the entirety of the home ranges of the PBS. (AR 1693.) Both sides do not dispute that the PBS are sensitive to habitat loss or modification because they are poor dispersers, learning their ranging patterns from older animals rather than on their own. (AR 5789.) Habitat loss is a leading cause of species extinction and endangerment. (AR 5789.) When habitat is lost, the PBS is likely to remain within their familiar surroundings. (AR 5789.) Young sheep learn their habitat ranges from their mothers and do not go out and colonize new ranges. (AR 5789; 3759 (The North American Wild Sheep). "Once habitat is lost or modified, the affected group is likely to remain within their

---

[9]Home range is defined as "that area traversed by the individual in its normal activities of food gathering, mating, and caring for young". (AR 5764.)

[12cv2212-GPC(PCL)]

familiar surroundings but with reduced likelihood of population persistence, due to reduced quantity and/or quality of resources." (AR 5789.)

The FWS considered the loss of habitat and its effect on the PBS and its habitat. In considering the loss of habitat, it also analyzed the impact on the sheep based on the fact that they are poor dispersers outside their home range. The BiOP did not ignore evidence that PBS are poor dispersers. In analyzing the fact that the PBS will avoid the Project area, the FWS analyzed the worst case scenario that the sheep will lose about 5,156 acres of habitat and this loss of habitat would not threaten its recovery. (AR 1701.) Accordingly, the Court concludes that the BiOp is not arbitrary and capricious as it considered the evidence that PBS are poor dispersers outside its home range.

**F.    Potential for Project to Cause Stress and Associated Adverse Effects**

Plaintiffs argue that the BiOp did not consider that noise and visual disturbance have numerous negative impacts on the PBS particularly since PBS are poor dispersers and will remain on the Project site.   They also argue that the BiOp's comparison of noise impacts[10] by comparing wind turbines to a ski lift because both involve overhead structure is not a rational basis to analyze the effect of the Project's noise effects on the PBS.

Federal Defendants maintain that the FWS noted that sheep will avoid a perceived threat such as the wind turbines and move to other areas of suitable habitat within their home range. Therefore, the sheep will not be exposed to the Project's effects. Moreover, the FWS considered low-frequency noise and visual disturbance on the PBS. (AR 1700.) Ocotillo argues that the BiOp adequately considered the low-frequency noise and movement impacts on the PBS.

The PBS' predator evasion behavior is based on its ability to visually detect danger at a distance. (AR 5760, FWS's 2000 PBS Recovery Plan.) It has long been

---

[10]Contrary to Plaintiffs' argument, the ski lift was used to assist in the visual disturbance analysis, not noise analysis.

recognized that visibility is an important characteristic of the PBS habitat.  (AR 5760.)  "Stress resulting from human disturbance may have played a role in predisposing captive lambs to disease."  (AR 5770.)  Bacterial pneumonia is usually a sign of weakness caused by another agent, such as a virus, parasite, or environmental stress, that lowers an animal's resistance to disease (USFWS 1998, p. 13144).  Poor nutrition, predation, climatic changes, and human related impacts may also have contributed to high lamb mortality.  (AR 6446-47, FWS' 5 year review of PBS, 2001.)

Plaintiffs rely heavily on one Master's candidate thesis analyzing human disturbance in PBS in the Pusch Ridge Wilderness ("PRW") in Arizona.[11]  (SAR 4070.)  In analyzing the effects of development in the PRW, the Bighorn sheep was surrounded on all sides by heavy vegetation, homes, a resort, construction activity or the city of Tucson.  In general, she stated that bighorn sheep can adapt to the presence of humans and coexistence is possible as long as escape terrain is still available and the herd has somewhere to take refuge from humans.  (SAR 4071.)  Because the PRW was surrounded on all sides, she concluded that the bighorn sheep in PRW will incur a significant amount of stress.  (SAR 4071.)  The author acknowledged that evidence of disturbance to bighorn sheep from noise is conflicting.  (SAR 4056.)  Bighorn sheep can become habituated[12] to noise after repeated exposure in cases where flights of small aircraft are 100m above ground level; however helicopters and low altitude aircraft cause negative behavioral responses.  (SAR 4056.)  Also, habituation to intermittent noise and bursts of sound from 75-100 decibels (dB) is gradual and minimal.  (SAR 4057.)  Stress in PBS can "lower resistance to disease, infection and parasites, inhibit reproductive functions and cause behavioral disturbances."  (SAR 4057.)  PBS will alter behavior in response to construction activities, traffic and road building.  (SAR 4057.)

---

[11]Kathryn Alyce Schoenecker, Human Disturbance in Bighorn Sheep Habitat, Pusch Ridge Wilderness, Arizona (1997) (unpublished M.A. thesis, University of Arizona).

[12]Habituation can also be defined as tolerance.  (SAR 7525.)

While the PBS appear to be tolerant to human activity, continued and frequent human use can cause them to avoid the area which interferes with the use of resources, such as water, mineral licks, lambing or feeding areas or use of traditional movement routs. (SAR 7510 (FWS BiOP for Sunrise Powerlink Project 2009).) In addition, human activity can cause physiological response such as elevated heart rate or changes in the endocrine systems even if no behavior response is detectable and the cumulative effect may affect the nutritional status of individuals. (SAR 7510.)

The BiOp considered and discussed the low-frequency noise and visual disturbance on the PBS. (AR 1700.) While it acknowledged that the effects of low frequency noise on PBS are unknown, it concluded that noise disturbance is something that the sheep would habituate. (AR 1700.) It based its conclusion on the fact that there already exists other noise levels that are high from the highway noise of I-8, OHV use and Border Patrol helicopter and vehicle patrols. (AR 1700.) The sheep have demonstrated an ability to adapt to the constant noise of vehicle speeds on I-8. It also noted visual disturbance would have a greater effect on PBS than noise disturbance. (AR 1700.) As discussed in the literature, vision is the primary sense the PBS use to detect predators. (AR 1700.) Therefore, the wind turbines would be perceived as a threat and would lead to habitat avoidance. (AR 1700.) The BiOp surmises that the blades' continuous movement, the flickering shadows blade movement would produce would be perceived by the PBS as a threat and lead to habitat avoidance in areas closest to the turbines. (AR 1700.)

The BiOp also acknowledged that the collective effect of increased human disturbance, vehicle access, low-frequency noise and visual disturbance of the wind turbines, moving blades and flickering shadows may cause sheep to avoid the Project and its vicinity. (AR 1700.) The FWS used a study concerning a ski lift as the best available data and determined that a 350-yard buffer around the Project site would be appropriate. (AR 1700-01.) Based on this, the FWS determined that about 5,156 acres of habitat would be functionally lost. (AR 1701.) In determining the effect of the loss

of 5,156 acres of habitat, the BiOp concluded that the loss of this habitat is not within critical habitat, represents a small fraction of comparable habitat otherwise available to the population and would not disrupt population connectivity or cause other significant impacts. (AR 1701.)  The BiOp also considered low-frequency noise and visual disturbance on lambing grounds.  (AR 1704-05.)

Contrary to Plaintiffs' assumption that the PBS would remain in the Project area and live with "chronically elevated stress levels", the FWS concluded that the PBS will avoid a perceived threat and move to other areas of suitable habitat within their home range.  The BiOp discussed its conclusion that sheep are more likely to avoid the facility and surrounding area. (AR 1698-1701.)  While it is documented that noise and visual disturbances cause stress in Bighorn sheep, Plaintiffs have not shown that sheep would not avoid the Project site.  The FWS does not dispute Plaintiffs' allegations that noise and visual impact could cause stress and noted that "lack of data concerning ungulate behavior around wind turbines underscores the importance of monitoring efforts in the project vicinity."  (AR 1698.)

Based on this analysis, the Court concludes that the BiOp assessment of the noise and visual impacts of the Project on the PBS was not arbitrary or capricious.

**G.    Best Available Science**

Plaintiffs assert that the FWS did not use the best available scientific data when it prepared its BiOp because it only references the lack of sheep sign to support its conclusion.  Federal Defendants and Ocotillo maintain that in addition to sheep sign, the FWS analyzed data from numerous other sources.

Under the Endangered Species Act, biological opinions must reflect the "best scientific and commercial data available."  See 16 U.S.C. § 1536(a)(2).  "The best available data requirement 'merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'" Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1080 (9th Cir. 2006).  The agency has considerable discretion in determining what constitutes the "best available data."  See

[12cv2212-GPC(PCL)]

1    Ecology Ctr. v. Castaneda, 574 F.3d 652, 659 (9th Cir. 2009).

2        Courts review the Biological Opinion based upon the evidence contained in the

3    administrative record. Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau

4    of Land Management, 273 F.3d 1229, 1245 (9th Cir. 2001) ("we review the Biological

5    Opinion based upon the evidence contained in the administrative record."). APA

6    review of a biological opinion is "based upon the evidence contained in the

7    administrative record." Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife, 273

8    F.3d 1229, 1245 (9th Cir. 2001). Plaintiffs mistakenly argue that the BiOp must

9    contain all the scientific data the FWS relies on to support its conclusion. In its

10   analysis, the Court must look at the entire administrative record in making its

11   determination whether the FWS's analysis in the BiOp was arbitrary or capricious. See

12   id.

13        First, Plaintiffs contend that while the FWS acknowledged that "sign" is an

14   unreliable way to determine whether sheep use an area[13], FWS repeatedly relied on sign

15   to support its conclusion the PBS use the Project site sporadically. Federal Defendants

16   and Ocotillo oppose contendingthat the FWS's sheep analysis did not focus solely on

17   sheep sign to indicate habitat use.

18        Federal Defendants and Ocotillo cite to numerous data, maps, surveys and other

19   evidence in the administrative record supporting the FWS's conclusion that PBS

20   sightings on the Project is limited. The FWS looked at data such as "suitable habitat"

21   maps from the recovery plan, (AR 5801); "critical habitat" maps, (AR 270, 346); and

22   surrounding habitat conditions. (AR 345, Nisa Marks, Biologist at FWS, handwritten

23   field notes on a site visit); (AR 612 (12/1/11 N. Marks' phone call notes with A.

24   Davenport)); (AR 4194-201 (biological assessment)); (AR 7039, notes). The FWS

25   also considered sheep occurrence data from different sources: sheep observations from

26

27        [13]Plaintiffs cite to an agency comment on the Draft EIS which stated, "The
     Department disagrees with the statement that the site is unoccupied. Based on the
     applicant's surveys PBS have not been documented within the project site footprint.

28   However, absence of sheep sign does not equate to the site being unoccupied." (AR
     421.)

[12cv2212-GPC(PCL)]

project survey crews, (AR 249 (biological assessment)); data from surrounding projects, (AR 3900 (PBS Baseline Report in Mountain Springs Grade for Sunrise Powerlink Project, January 2009-May 2010)); FWS employee, (AR 4953-54); California Department of Fish and Wildlife[14] radio collar data[15], (AR 4194); historical information, (AR 5155-56 (article/study 1998)); (AR 5782; 5822 (PBS Recovery Plan, 2000)); (AR 7011 (article, 1994)); (AR 7029 (article, 1996)); (AR 7254 (CDFG report study, 1972)); (AR 7446 (article/survey 1968)); and CDFG aerial surveys, (AR 1694 (BiOp)). This data was sufficient to estimate the number of ewes using habitat within 600 yards of the Project's footprint for the BiOp's incidental take statement. (AR 1720.)

The FWS also considered three months of on-site surveys conducted by trained trackers who used motion-sensitive cameras. (AR 273-274; 282-287; 313-329 (Tracking Report, March-June 2011).) There were also additional months of on-site surveys of PBS. (AR 831-857.) Contrary to Plaintiffs' argument, the FWS considered an array of different scientific data, besides "sign", to support its conclusion that sheep use in the Project area is sporadic.

In addition, Plaintiffs complain that the FWS failed to consider the Center for Biological Diversity's ("CBD") documentation, on March 11, 2012, of PBS use of a known lambing area within 500 meters of Turbine No. 25. (AR 1329-30.) Federal Defendants contend that the CBD data is in the record, was considered by the FWS and

---

[14]California Department of Fish and Wildlife was formerly known as California Department of Fish and Game ("CDFG")

[15]"HELIX [the group hired by Ocotillo to create the Biological Assessment] coordinated with CDFG to obtain unpublished PBS location data from a radio collar/tracking study currently being conducted as mitigation for the Department of Homeland Security/Border Patrol U.S.-Mexico border fence project. Six PBS ewes were captured and radio collared by CDFG in October 2009 in the vicinity of MountainSpring and their locations are being monitored and documented by CDFG. Location data of the 6 radio-collared ewes were provided for the period between October 2009 and January 2011, including lambing areas used in 2010 (email from Randy Botta to Pete Sorenson dated February 19, 2011). The 6 collared ewes represent less than 10 percent of the estimated population in the area. The PBS location data were used in combination with the USFWS database of PBS sightings to evaluate sheep use within and adjacent to the Project Area." (AR 4194.)

was found to overlap with previous sheep sightings within the I-8 Island. (AR 1328-1335) (AR1665 (map of March 2012 sighting and other PBS occurrence dated April 12, 2012.)) The Biological Opinion was issued on April 26, 2012, after the CBD's documentation. The administrative record demonstrates that the FWS considered this data. Moreover, the map prepared on April 12, 2012, reveals that the observations were consistent with prior observations of PBS in that area. Accordingly, Plaintiffs' arguments are without merit and the Court concludes that the FWS used the best scientific data available.

### Conclusion

Based on the above, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Federal Defendants and Ocotillo Defendant's motions for summary judgment. The Court **vacates** the hearing date set for November 22, 2013. The Clerk of Court shall close the case.

IT IS SO ORDERED.

DATED: November 20, 2013

HON. GONZALO P. CURIEL
United States District Judge

[12cv2212-GPC(PCL)]